IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KEVIN ERVIN, )<br>)<br>   Plaintiff, )<br>)<br>vs. )<br>)<br>DEBRUCE GRAIN, INC., )<br>)<br>   Defendant. )<br>) | 8:04CV180<br><br>**MEMORANDUM<br>AND ORDER** |

Plaintiff Kevin Ervin (Ervin) brought this action against his former employer, defendant DeBruce Grain, Inc. (DeBruce), claiming age discrimination. Presently before the court is DeBruce's motion for summary judgment (Filing No. 30). DeBruce filed a brief (Filing No. 31), an index of evidence (Filing No. 32), a reply brief (Filing No. 37), and a supplemental index of evidence (Filing No. 36) in support of the motion. Ervin filed a brief (Filing No. 33) and an index of evidence (Filing No. 34) in opposition to the motion. For the reasons set forth below, the court grants DeBruce's motion for summary judgment.

I.  BACKGROUND
 A. Factual Background

The following facts have been submitted or admitted by Ervin or are viewed in the light most favorable to Ervin.[1]  In May 2000, DeBruce hired Ervin to work as a laborer at DeBruce's Nebraska City, Nebraska facility (Nebraska City facility). (Ervin Aff at ¶ 2). DeBruce is a grain storage and shipping company. (Id. at ¶ 4). DeBruce purchases grain from farmers, stores the grain, and then loads the grain onto rail cars for delivery to customers. (DeBruce Fact Stmt at ¶¶ 6-7). Conveyer belts move the grain to a load-out chute, and the load-out chute, which is operated by a computerized remote control system,

---

[1] Ervin denied only six of DeBruce's sixty-seven statements of uncontroverted facts submitted by DeBruce pursuant to Local Rule 56.1(a)(1).

dumps the grain into rail cars. (Id. at ¶ 8). A computerized remote control system also moves locomotives, which move the rail cars into position. (Id. at ¶ 9). The rail cars each have a top hatch, which is opened manually before the loading process begins. The loading operator positions each car under the load-out chute, and the load-out chute deposits grain into the rail car. Once the rail car is loaded, it is moved forward and the next empty car is moved to the appropriate spot for loading. (Id. at ¶ 10). Each car must be loaded to specification, and if it is under or over loaded, it must be dumped and reloaded. Loading rail cars by remote is a significant responsibility which takes concentration, hand/eye coordination, timing, and it is a high pressure job. (Id. at ¶ 31).

The tracks on which the rail cars travel are on a slight grade ranging from .2 to .4 percent. Before December 30, 2002, the Nebraska City facility loaded rail cars by pulling them up the slight grade. (Id. at ¶¶ 10-11). When rail cars were being loaded upgrade, it took approximately 13 to 15 hours to load 75 cars. (Id. at ¶ 21).

Ervin worked as a loading operator for DeBruce. Ervin's duties included loading rail cars, operating the load-out system, ensuring correct load weights, and training newly hired loaders. (Ervin Aff at ¶ 3). Before working for DeBruce, Ervin did not have any experience loading grain onto rail cars (Id. at ¶ 5), but Ervin became the primary and only fully trained loader at the Nebraska City facility. He was a very skilled loader, and he was the only laborer with experience loading without supervision. (DeBruce Fact Stmt at ¶ 27).

Jeff Caskey (Caskey), a previous superintendent at the Nebraska City facility, used downgrade loading on two separate occasions in an attempt to improve loading efficiency. (Id. at ¶ 13; Ervin Aff at ¶ 9). No laborers, or any other employees, were injured during these downgrade loading trials. (DeBruce Fact Stmt at ¶ 15). Both upgrade loading and downgrade loading involve a certain amount of risk, but downgrade loading is more efficient, because it saves fuel and takes less time to complete loading a string of cars. (Id. at ¶¶ 25, 19). Following these trial attempts, DeBruce's Nebraska City facility continued

loading trains on an upward incline, because productivity demands prevented full implementation of downgrade loading. (Id. at ¶ 14).

Ervin believed downgrade loading posed "significant safety risks[,]" because the rail cars "were uncontrollable, [Ervin] had poor visibility of other laborers working on top of the railcars and the timing did not work." (Ervin Aff at ¶ 10). Ervin did not do any research regarding the relative safety of downgrade versus upgrade loading; his opinion is based on the two trial runs. (DeBruce Fact Stmt at ¶ 26). In March or April 2001, Ervin told Caskey and Ray Pinney (Pinney), the DeBruce Nebraska City facility manager from June 1995 to April 2003 (Id. at ¶ 12), about Ervin's safety concerns regarding downgrade loading. (Ervin Aff at ¶ 12). In the summer of 2002, during the second attempt of downgrade loading, Ervin again voiced his safety concerns to Tim Fiala (Fiala) and Pinney. Ervin also discussed safety issues with other DeBruce management-level employees during their visits to the Nebraska City facility. (Id. at ¶ 13).

In September 2002, John Bleavins (Bleavins) became Ervin's supervisor and the superintendent of the Nebraska City facility. (Id. at ¶ 14). Bleavins's duties included scheduling and conducting the operations of the facility; preparing profit and loss sheets; managing the laborers at the facility, including discipline if necessary; and assisting laborers with the loading process. Bleavins had previous experience at a DeBruce facility in Wichita, Kansas, that used downgrade loading. (DeBruce Fact Stmt at ¶¶ 16-17). In late December 2002, Bleavins began implementing downgrade loading at the Nebraska City facility. (Id. at ¶ 18).

On December 30, 2002, Pinney and Bleavins told the Nebraska City facility employees they would begin loading downgrade. (Ervin Aff at ¶ 15). Later that same day, Ervin told Bleavins that downgrade loading would not work, because Ervin had tried downgrade loading before and it had not worked; that loading downgrade was not safe; and that there was less control over the rail cars. (DeBruce Fact Stmt at ¶ 38; Ervin Aff at

¶ 15). Bleavins and Ervin had a dispute regarding how long it would take to load the cars using the downgrade loading system, and Ervin refused to look at audit tapes which would show how long downgrade loading would take. (DeBruce Fact Stmt at ¶ 40). At some point during the dispute, Bleavins referred to Ervin as "older and set in [his] ways." (Ervin Aff at ¶ 15). Pinney told Ervin he should give Bleavins a chance to try downward grade loading. (DeBruce Fact Stmt at ¶ 41).

Bleavins expected Ervin, as the only laborer fully trained on loading, to continue to be responsible for loading. (Id. at ¶ 28). Bleavins did not trust some of the employees at the Nebraska City facility to load grain cars, and he would not assign an employee to load who did not demonstrate the responsibility required of a loader. (Id. at ¶ 32).

On December 31, 2002, while Bleavins was loading downgrade, he asked Ervin to assist him, because Ervin was the primary loader and the only fully trained loader. (Id. at ¶ 42). Ervin "refused to load the train unless it was being loaded uphill." (Ervin Aff at ¶ 16). Ervin periodically assisted Bleavins with any questions he had regarding the load-out system, but Ervin refused to stay with Bleavins and instead worked on top of the grain cars, either closing and sealing the hatches or blowing off the loose grain. (DeBruce Fact Stmt at ¶ 42; Ervin Aff at ¶ 16). Later that same day, Bleavins announced to the loading crew that Darrell McVicker (McVicker), another DeBruce employee, would be replacing Ervin as the "Load-Out Man." (Ervin Aff at ¶ 17).

On January 2, 2003, Bleavins again ordered Ervin to load the cars downgrade, but Ervin again refused, stating his safety concerns. (DeBruce Fact Stmt at ¶ 44; Ervin Aff at ¶ 18). Ervin told Bleavins he felt he "was being discriminated against because [Ervin] was the only laborer that [Bleavins] requested to load the train." (Ervin Aff at ¶ 18). Bleavins told Ervin that if he refused to load the cars, Bleavins would terminate Ervin's employment. When Bleavins again refused to load, Bleavins terminated Ervin's employment. (DeBruce

Fact Stmt at ¶ 44). At the time his employment was terminated, Ervin was forty-three years old. (Id. at ¶ 3; Ervin Aff at ¶ 22).

Ervin recalls that from the date he started loading in October 2000, DeBruce management-level employees–including Pinney; Fiala; Jim Rothermich (Rothermich), an assistant superintendent; and Greg White (White)–referred to Ervin as "the old man." (Ervin Aff at ¶ 28; Ervin depo at 82:17-83:12). However, Ervin never complained to Bleavins that any laborer or manager at DeBruce called him an old man or said he was set in his ways. (DeBruce Fact Stmt at ¶ 62).

After Bleavins terminated Ervin's employment, Bleavins asked Troy Watkins (Watkins) and Mark Lant (Lant), laborers at the Nebraska City facility, who both were in their early twenties, if they would load downgrade. Both Watkins and Lant refused, but DeBruce did not terminate their employment. (Ervin Aff at ¶ 20). Neither Watkins nor Lant had ever actually loaded a rail car, and neither appeared to have any interest in learning to load grain cars regardless of whether the cars were loaded upgrade or downgrade. (DeBruce Fact Stmt at ¶¶ 63, 33). Watkins had not been trained to operate the load-out system, and Lant did not feel comfortable loading without supervision. (Id. at ¶¶ 64-65). Ervin would have had to train Watkins and Lant to load. (Id. at ¶ 66). Bleavins did not believe Watkins and Lant had the maturity or responsibility required to be a loader. (Id. at ¶ 35).

After DeBruce terminated Ervin's employment, Bleavins continued to load grain cars until other laborers could be trained. (Id. at ¶ 45). Following the termination of Ervin's employment, McVicker, who was in his thirties, started loading. McVicker, who had some previous experience loading rail cars under Ervin's supervision, learned the process and became the primary loader for several months. (Id. at ¶ 46).

From December 30, 2002 to the present, the Nebraska City facility has continued to load cars downgrade. (Id. at ¶¶ 20, 47). The Nebraska City facility currently loads downgrade, and the facility loads 100 cars in 10 hours. (Id. at ¶ 23). There have been no injuries at the Nebraska City facility while loading downgrade. (Id. at ¶ 47).

During Ervin's employment with DeBruce, DeBruce never received a single complaint from the Occupational Safety and Health Administration (OSHA) regarding the Nebraska City facility. (Id. at ¶ 49). While he was employed by DeBruce, Ervin never said downgrade loading violated OSHA regulations, or that he was going to call OSHA. (Id. at ¶ 50). In January 2003, Ervin filed an OSHA complaint regarding the load-out process (i.e., loading downgrade) at the Nebraska City facility. (Id. at ¶ 51; Ervin Aff at ¶ 21). OSHA closed its investigation without requiring DeBruce to make any changes to its load-out process. (DeBruce Fact Stmt at ¶¶ 53-54).

### B.   Procedural Background

Ervin filed suit against DeBruce, alleging DeBruce terminated his employment because of his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, and in violation of Nebraska's Act Prohibiting Unjust Discrimination in Employment Because of Age (Nebraska's Age Discrimination Act), Neb. Rev. Stat. §§ 48-1001 through 48-1010.

DeBruce moves for summary judgment on Ervin's claim that DeBruce discriminated against him because of his age, arguing (1) Ervin cannot establish a prima facie case of age discrimination, and (2) Ervin failed to show DeBruce's reason for terminating Ervin's employment (i.e., insubordination) is a pretext for intentional age discrimination. (DeBruce Br. at 13, 14). Ervin filed a timely opposition to DeBruce's motion for summary judgment, contending summary judgment is inappropriate, because there are genuine issues of material fact in dispute regarding his claim of age discrimination.

The court exercises jurisdiction over this action pursuant to its federal question jurisdiction under 28 U.S.C. § 1331, because this case arises in part under the ADEA. The court has jurisdiction over Ervin's state law claim alleging violation of Nebraska's Age Discrimination Act pursuant to the court's supplemental jurisdiction under 28 U.S.C. § 1367(a), which confers "jurisdiction over all claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if the record, viewed in the light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

Procedurally, the moving party bears the burden to demonstrate the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. Id. at 248. Once the moving party successfully carries its burden, the burden shifts to the nonmoving party, who may not rest upon just the allegations or denials of its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324; Fed. R. Civ. P. 56(e). The nonmoving party must offer evidence "such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The United States Court of Appeals for the Eighth Circuit cautions, "summary judgment should seldom be used in employment-discrimination cases." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)).  Summary judgment is appropriate in employment discrimination cases "only in those rare instances where there is no dispute of fact and where there exists only one conclusion." Johnson, 931 F.2d at 1244. To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." Crawford, 37 F.3d at 1341. This is one of those cases where the evidence does not support a reasonable inference of intentional discrimination.

### B.   Age Discrimination

The ADEA prohibits an employer from discharging an employee who is forty years of age and older, because of the employee's age. See 29 U.S.C. §§ 631(a), 623(a)(1); Hitt v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004).[2] Because Ervin has no direct evidence of age discrimination, the parties agree Ervin must proceed under the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hitt, 356 F.3d at 924 (applying the McDonnell Douglas analysis to an ADEA claim).

Under McDonnell Douglas, the plaintiff has the burden of establishing a prima facie case for discrimination. Id. If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the employer satisfies its burden of production, the burden shifts

---

[2]Ervin filed his claim of age discrimination under both the ADEA and Nebraska's Age Discrimination Act. Because Nebraska courts frequently look to the ADEA when reviewing claims under Nebraska's Age Discrimination Act, see Billingsley v. BFM Liquor Mgmt., Inc., 645 N.W.2d 791, 801 (Neb. 2002), it is appropriate for this court to analyze both claims jointly.

back to the plaintiff to show the employer's articulated reason merely was a pretext for discrimination. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 253 (1981).

### 1. Prima Facie Case

Under the McDonnell Douglas burden-shifting framework, Ervin first must present a prima facie case of age discrimination by showing: "(1) he is a member of a protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was discharged; and (4) he was replaced by a younger worker." Id. For purposes of summary judgment, the parties agree Ervin is a member of a protected age group, DeBruce terminated his employment, and DeBruce replaced him with a younger worker. However, the parties disagree as to whether there is a genuine issue of fact with respect to whether Ervin was performing his job at a level that met DeBruce's legitimate expectations.

"The standard for assessing performance 'is not that of the ideal employee, but rather what the employer could legitimately expect.'" Calder v. TCI Cablevision of Mo., Inc., 298 F.3d 723, 729 (8th Cir. 2002) (quoting Keathley v. Ameritech Corp., 187 F.3d 915, 920 (8th Cir. 1999)). "The fact that an employee meets some expectations, however, does not mean that [he] meets the standard if [he] does not meet other significant expectations." Id.

The uncontroverted evidence shows Ervin cannot satisfy the second prong of the prima facie case, i.e., Ervin did not perform his job at a level which met DeBruce's legitimate expectations. DeBruce legitimately expected Ervin not to be insubordinate in performing his job. Although Ervin was an experienced and skilled loader, he repeatedly refused Bleavins's orders to load the cars downgrade, even after Bleavins warned Ervin his continued refusal would lead to termination of his employment. When Ervin repeatedly was insubordinate by refusing to perform his essential job duties under legitimate direct

orders to do so, DeBruce had the right to discharge Ervin. See Miner v. Bi-State Dev. Agency, 943 F.2d 912, 913-14 (8th Cir. 1991) (holding evidence of insubordination shows employee was not meeting employer's legitimate expectations).[3]  Because Ervin cannot establish a prima facie case of age discrimination, the court grants summary judgment in favor of DeBruce.

### 2. Articulated Reason

Assuming Ervin established a prima facie case, the burden shifts to DeBruce to produce a legitimate, nondiscriminatory reason for terminating Ervin's employment. Hitt, 356 F.3d at 924. DeBruce states it terminated Ervin's employment due to his insubordination to Bleavins in refusing to load the rail cars downgrade. Accordingly, upon review of the record, the court concludes DeBruce has carried its burden of articulating a legitimate, nondiscriminatory reason for terminating Ervin's employment. See Kempcke v. Monsanto Co., 132 F.3d 442, 446 (8th Cir. 1998) (stating "employee insubordination is ordinarily a legitimate non-discriminatory reason for adverse action"); see also Miner, 943 F.2d at 914 (stating an employee's "insubordination constituted a nondiscriminatory reason for [the employer] to terminate his employment").

### 3. Pretext

If the employer articulates a legitimate, nondiscriminatory reason, then the presumption of discrimination disappears, and the plaintiff avoids summary judgment only if he presents evidence creating (1) a genuine question of material fact regarding whether the employer's proffered reasons are pretext, and (2) a reasonable inference that age was a determinative factor in the employer's decision. Kohrt v. MidAmerican Energy Co., 364 F.3d 894, 897 (8th Cir. 2004). If the plaintiff cannot show the employer's proffered reasons

---

[3] Ervin implies he was not insubordinate in the performance of his essential job duties because he refused to work based on safety concerns. Although this contention would be relevant to claims under the Occupational Safety and Health Act, 29 U.S.C. §§ 651-78, or the National Labor Relations Act, 29 U.S.C. §§ 151-69, the ADEA does not excuse older employees being insubordinate based on safety concerns.

were a pretext for discrimination, then the employer is entitled to summary judgment. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty Affairs, 450 U.S. at 253.

Ervin asserts he has presented sufficient evidence to raise an inference that DeBruce's reason for terminating his employment was pretextual. As evidence of pretext, Ervin points to the following evidence: (1) Bleavins asked both Watkins and Lant to load downgrade, but when both Watkins and Lant refused, DeBruce did not terminate Lant's or Watkins's employment; and (2) Bleavins and other management-level employees made age-based comments about Ervin.[4]

### a. Disparate Treatment

Ervin argues DeBruce's treatment of Watkins and Lant suggests pretext, because these younger employees were similarly situated to Ervin, but DeBruce did not terminate their employment for refusing to load downgrade. Evidence of disparate treatment can support an assertion of pretext, but the plaintiff has the burden to prove the "younger employees were 'similarly situated in all relevant respects.'" Bennett v. Watters, 260 F.3d 925, 930 (8th Cir. 2001) (quoting Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994)).

Ervin's argument fails, because Watkins and Lant were not similarly situated to Ervin. Ervin was the only laborer with experience loading without supervision. (DeBruce

---

[4] In support of his opposition to DeBruce's motion for summary judgment, Ervin submits an affidavit stating that on the day he was terminated, January 2, 2003, Bleavins referred to Ervin as "older and set in [his] ways." (Ervin Aff ¶ 27). Because Ervin did not make this allegation in his sworn deposition or explain why he did not provide this testimony in his deposition, the court shall disregard this statement for summary judgment purposes. See RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995) (holding affidavit that contradicts earlier sworn testimony and does not explain contradiction, cannot defeat summary judgment).

Fact Stmt ¶ 27). Indeed, Ervin was a very skilled loader and was the Nebraska City facility's primary and only fully trained loader. Watkins and Lant were not fully trained or as experienced as Ervin. Watkins did not know how to run the computer used to operate the load-out system, (Watkins depo at 16:17-18), and Lant testified in his deposition he "would not have felt comfortable just jumping in and taking over the controls by [himself] without some sort of supervision." (Lant depo at 16:24-17:1). Additionally, Ervin has not provided any evidence that DeBruce has not terminated any employee's employment where the employee refuses to perform his essential job functions. Again, Lant's and Watkins's essential job functions did not include Ervin's job function; i.e., Ervin was the only fully trained loader, and he refused to perform his essential job duties. Ervin refused to do his assigned job; Watkins and Lant did not refuse to do their assigned jobs. Therefore, the court concludes Ervin was not similarly situated to Watkins and Lant for purposes of proving pretext. See id. (holding the plaintiff failed to prove pretext where she presented no proof younger workers were similarly situated).[5]

### b. Age-Based Comments

Finally, Ervin contends evidence of age-based comments made by Bleavins and other management-level employees support his assertion of pretext. In response, DeBruce argues: (1) Bleavins's one-time comment on December 30, 2002, that Ervin was "older and set in [his] ways" is the type of stray remark that is insufficient to demonstrate pretext; (2) Ervin's age did not play any role in Bleavins's decision to terminate Ervin's employment; and (3) Bleavins did not base his decision to terminate Ervin's employment on age-based comments made by other management-level employees.

Age-based statements may constitute evidence of a discriminatory attitude. Madel v. FCI Marketing, Inc., 116 F.3d 1247, 1252 (8th Cir. 1997). However, "[n]ot all comments

---

[5]To the extent Ervin contends DeBruce should have forced Watkins and Lant to retrain and assume Ervin's job duties, this court will not sit as DeBruce's super-personnel department and dictate DeBruce's business. See Mayer v. Nextel West Corp., 318 F.3d 803, 810 (8th Cir. 2003).

that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision." Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir. 1993). For purposes of deciding whether direct evidence of discrimination exists, the Eighth Circuit distinguishes "comments which demonstrate a discriminatory animus in the decisional process from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1157 (8th Cir. 1999) (citations omitted). Stray remarks, standing alone, may not give rise to an inference of discrimination. See Fast v. So. Union Co., 149 F.3d 885, 891 n.6 (8th Cir. 1998). Stray remarks may, however, constitute circumstantial evidence that, when considered together with other evidence, can give rise to a reasonable inference of discrimination. See id. at 891-92.

Ervin asserts Bleavins's statement on December 30, 2002, in which Bleavins referred to Ervin as "older and set in [his] ways[,]" is sufficient to demonstrate pretext. However, Bleavins's statement occurred when Bleavins and Ervin were engaged in a dispute regarding the change in the loading process. Ervin presented no evidence to establish a causal relationship between Bleavins's comment and the termination of Ervin's employment. For example, had Ervin been thirty-nine years old and worked for DeBruce for twenty years, Bleavins's comment would be relevant.[6] Because Bleavins's comment was unrelated to the decisionmaking process and fails to overcome DeBruce's reason for terminating Ervin's employment (i.e., insubordination), the court concludes the comment was a stray remark insufficient to infer Bleavins's decision to terminate Ervin's employment was due to intentional age discrimination. See Montgomery v. John Deere & Co., 169 F.3d 556, 560-61 (8th Cir. 1999) (holding supervisor's frequent references to the plaintiff as "the

---

[6] Ervin also offers no evidence to show, or to create a reasonable inference, Bleavins knew Ervin was forty-three years old. See Hitt, 356 F.3d at 925. Bleavins indicated he did not know Ervin's age and thought Ervin was in his thirties. (Bleavins Aff at ¶ 43). The evidence is undisputed DeBruce hired Ervin without regard to his age, and DeBruce would have continued to employ Ervin if he had performed his job and not refused to load downgrade.

old fart" did not give rise to inference of age discrimination where the plaintiff's prima facie case was weak and the plaintiff offered no other evidence of pretext); Reynolds v. Land O'Lakes, Inc., 112 F.3d 358, 363 (8th Cir. 1997) (holding supervisor's references to the plaintiff as an "old fart" were mere stray remarks where there was no evidence of a causal connection between the statements and the termination of the plaintiff's employment).

The court further concludes evidence of age-based comments made by other management-level employees at DeBruce is insufficient to support an inference of intentional age discrimination on Bleavins's part. From the date Ervin started loading in October 2000, management-level employees at DeBruce, including Pinney, Fiala, Rothermich, and White, allegedly referred to Ervin as "the old man." However, Ervin presented no evidence to suggest Pinney, Fiala, Rothermich, or White made discriminatory comments to Bleavins in an effort to influence Bleavins to terminate Ervin's employment, nor is there any evidence to suggest Bleavins formed his decision to terminate Ervin's employment based on such comments. The court concludes these comments are "stray remarks" by nondecisionmakers, and therefore, insufficient to establish pretext. See Hitt, 356 F.3d at 925 (holding comments calling the plaintiff an "old man" were stray remarks made by persons other than a decisionmaker, and, therefore, were not persuasive evidence of discriminatory motive in an ADEA action).

In short, the court concludes there is insufficient evidence for a reasonable jury to conclude Bleavins terminated Ervin's employment because of Ervin's age.

### III. CONCLUSION

For the reasons discussed, the court concludes DeBruce is entitled to summary judgment on Ervin's age discrimination claims, because Ervin failed to provide sufficient evidence to prove his age was a determinative factor in DeBruce's termination of Ervin's employment.

**IT IS THEREFORE ORDERED:**

1. DeBruce's motion for summary judgment (Filing No. 30) is granted;

2. This action and Ervin's complaint are dismissed with prejudice; and

3. Pursuant to Fed. R. Civ. P. 58, a separate Judgment will be entered in accordance with this Order.

Dated this 6th day of May, 2005.

BY THE COURT:

s/ William Jay Riley
United States Circuit Judge
(Sitting by Designation)